HONORABLE THOMAS McKITTRICK
dissenting:
I dissent from the Majority opinion.
This case is about homeowners and their right to organize to establish reasonable standards for the aesthetic preservation and architectural consistency of their neighborhood and then rely on those standards when they are objected to by someone who is fully aware of their existence prior to purchasing his property.
This case is also about whether developers can establish a self-governing group of directors elected from among the homeowners who reside in the neighborhood developed and then, contrary to the Articles of Incorporation, Bylaws, and Restrictive Covenants, throw those people out of office when their decisions are inconvenient or contrary to the wishes of one of the developers.
In addition, this case is about whether a developer can impose restrictive covenants on other homeowners who purchase lots and build homes in his development, even though many of those homeowners incurred additional expense to comply with these requirements, and then arrogantly and deliberately ignore the requirements when he decides to build his own home in the same neighborhood.
Trieweiler is a homeowner who filed an Injunction to enforce an *330 intentionally violated covenant at the Grouse Mountain Development (Development), a subdivision near Whitefish, Montana.
In 1979, the general partner of the Development, Brian T. Grattan, filed with the Clerk and Recorder’s Office of Flathead County, Montana, a Declaration of Conditions, Covenants and Restrictions. In relevant part paragraph 15 reads:
Architectural Control. ... that no building shall be commenced upon the property until the plans and specifications were submitted and approved by the committee.
Pursuant to paragraph 15, the acting Board of Directors appointed an Architectural Committee. At the 1989 Annual Homeowners Meeting, Committee I submitted to the homeowners, for their approval, xrdnimum Architectural Standards (Guidelines). The homeowners unanimously approved the guidelines at the meeting.
Prior to the guidelines approval, Committee I had mailed a copy of the guidelines to every owner of every lot in the development.
William R. Spicher (Spichers) was an original partner in the development, and in fact was one of its largest investors. As such, he was a partner of Grattans and was aware of the Articles of Incorporation, Bylaws and Restrictive Covenants. Spichers owned lot 64 in the development and had bought the land subject to the restrictive covenants. In late summer of 1989, Spicher contracted with Ping Construction (Ping) to build a home.
There is no dispute that all parties, including Spichers and Ping, knew of paragraph 15 (the covenant) and the guidelines. Yet, the Spichers, through Ping, chose to disregard the guidelines by submitting plans to build their home with an imitation-tile roofing — Material I — and stain their house a gray color. Committee I rejected:
(1) Material I because it was an imitation-tile concrete composition roofing material that did not meet the guidelines and had never been used in the development before; and
(2) the gray color stain because seven of the last ten homes built in the neighborhood were of some gray variation, including a home next to Spicher’s lot.
Committee I, in a letter to the Spichers, stated that “Committee I [was] willing to consider a broad spectrum of earth tone colors.” Committee I “want[ed] to avoid [a] predominance of one or two colors [in an area] and the construction of homes in a row [of] the same color.”
The Spichers through their contractor resubmitted three new colors and roofing material (Material II). Committee I again rejected *331 a gray color but approved a mushroom and Aspen tan color and as a compromise approved Material II on the condition the Spichers sign a written agreement to replace the roof if damaged by the weather. The Spichers were insulted and tried to meet with Committee I members without Trieweiler present. Trieweiler not wanting to waste any more of his time trying to hammer out a compromise with the Spichers, never again acted as an intermediary between the Spichers and Committee I.
The Spichers then retained an attorney who wrote a letter to Committee I. Committee I wrote back saying the Spicher’s actions destroyed any chance for compromise and that a meeting with the Spichers would not benefit either party. Contrary to Committee I’s decision, the Spichers did what they “wanted to do in the first place ...” and built their home with the rejected imitation-tile Material I and stained the house a gray color.
In May of 1990 the homeowners held a meeting to elect a new Board of Directors. Mr. Spicher’s former partner and original developer (Grattan) approached the homeowners with a deal. Grattan proposed that he would not invoke his power to appoint a new Board of Directors under Article VII of the Articles of Incorporation, but would assign it to the homeowners at the meeting if the homeowners would allow him to vote his unassessed eleven lots. The deal was struck and the homeowners elected a new Board of Directors who in turn appointed a new Architectural Committee (Committee II). Spichers went before Committee II seeking approval. Committee II, largely a result of Grattan’s and Spicher’s votes at the May meeting, refused to approve Spicher’s home. For that reason, and that reason only, Grattan broke his promise to the homeowners and unilaterally terminated the Board of Directors. He appointed himself and four others to the new Board. Prior to Grattan’s appointment of the new Board, Mr. Spicher contacted each new director and asked them if they would serve on his “New Board of Directors”. The new Board appointed Committee III. Committee III approved Spicher’s home “as built”.
The Majority has trouble following Gosnay v. Big Sky Owners Assn., 205 Mont. 221, 666 P.2d 1247. The case is clearly on point but the Majority chooses to create a different result. In Gosnay, the Supreme Court reversed the District Court and enforced a similar restrictive covenant as a matter of law, against an owner with a “jackleg” fence. 205 Mont. at 227. The “construction of a fence require[d] prior approval by the Architectural Committee .... The Ar *332 chitectural Committee refused Gosnays permission to build their fence [since the] Gosna/s fence [was] contrary to Big Sky’s overall plan for openness.” Id. The Court went on to state that although some fences had been approved, a jackleg fence had never been approved.
Similarly, here, Committee I needed to approve all plans to build in the development. Committee I rejected the Spichers plans because the imitation-tile Material I failed to meet the guidelines or overall plan for uniform roofing and had never been used in the subdivision before. Rejection of the color gray was based on the overall plan to protect the property owners’ investments.
This Court, as a matter of law, should have followed its prior decision in Gosnay and enforced the restrictive covenant against the Spichers. But they did not.
Instead the Majority uses creative reasoning when it states that “whether the exercise of power to approve construction plans was reasonable or arbitrary is a factual question to be determined in light of the circumstances.” The Majority, however, seems to conveniently forget to consider the question of reasonableness in light of all the circumstances. Spichers built their home the way they “wanted to build it in the first place.” They used imitation- tile Material I for their roof and stained their home gray, thus violating:
(1) the restrictive covenant because they did not get prior approval from any legally appointed committee to use Material I or the color gray;
(2) the guidelines because the imitation-tile Material I violated the overall plan for uniform roofing as well as fire and weather safe roofs, and the gray color because the overall plan allowed the Committee to control the color of exterior materials used on homes. The Committee felt that the domination of one color would give the homes in the development the appearance of tract housing. The Committee rejected the color to protect the neighborhood’s property values. See Gosnay v. Big Sky Owners Ass’n., 205 Mont. 221, 666 P.2d 1247, 1250 (1983).
The Majority found a question of fact in the guidelines. They asked, does the roofing guideline mean only two choices or does it mean that superior material can be used? There is a question of fact here only if the guidelines are read alone. The facts, however, should come to this Court’s rescue and clear the muddied waters. Committee I has answered the Court’s and Spicher’s question. There are more than two choices, but Committee I, or at least a legally appointed committee, had to approve the choices that were not spelled out in the *333 guidelines. Further, Committee I specifically rejected Material I and sent a message to the Spichers not to use Material I. Spichers ignored that message and so has the Majority of this Court. Spichers could have used a listed roofing material, but chose to use Material I after Committee I vehemently rejected Material I because it was imitation-tile never used in the subdivision. Committee I supplied the answer to the question — Material I did not meet the guidelines — no question of fact exists as to Material I — it did not meet the guidelines.
Next the Majority finds a question of fact in whether or not Committee I objectively and reasonably rejected the gray color. Again, the Majority seems to ignore the facts. The facts clear the path to show, as a matter of law, the Committee acted objectively and reasonably.
Seven of the last ten homes built in the neighborhood were of some gray variation, including a home adjacent to Spichers. The Committee felt another gray home in the area would give the appearance of tract housing which would devalue the neighborhood properties. In trying to protect property owners’ values, the Committee precluded Spichers use of the gray color. See Rhue v. Cheyenne Homes Inc., 449 P.2d 361, 363 (Colo. 1969). The Committee did not, as the Majority suggests, impose its whims or aesthetic tastes on the Spichers. See Donoghue v. Prynnwood Corp., 255 N.E.2d 326, 40 ALR 3d 858 (Mass. 1970). To the contrary, Committee I objectively and reasonably followed the overall plan and tried to protect the investment of home and lot owners. No question of fact existed. The Committee acted reasonably for the protection of all owners within the development.
Since there are no questions of fact, the Gosnay decision should control and the District Court’s Summary Judgment’ ruling should be upheld by this Court. Instead the Majority chooses to be creative and in their rush to achieve their desired result and keep this litigation alive have failed to consider the repercussions which will seriously impair the rights of property owners to establish and control architectural development and aesthetic preservation in their neighborhoods.